UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

MELISSA KELLEY-HILTON,                                    Civ. Action No.

               Plaintiff,

      v.                                                **COMPLAINT**
                                     **AND DEMDAND**
                                     **FOR JURY TRIAL**

STERLING INFOSYSTEMS INC.,

               Defendant.
-----------------------------------------------------------------------x

      Plaintiff Melissa Kelley-Hilton, by her attorneys Giskan Solotaroff & Anderson LLP,

alleges as follows for her complaint against Defendant Sterling Infosystems Inc.:

## <u>INTRODUCTION</u>

      1.    In this action, filed pursuant to the diversity jurisdiction of the Court, Plaintiff

Melissa Kelley-Hilton, who was employed in Colorado by New York-based Defendant Sterling

Infosystems, alleges wrongful discharge in violation of public policy in violation of Colorado

common law.  Ms. Kelley-Hilton seeks a declaratory judgment that, given her wrongful, without

cause discharge, among other reasons, her non-compete agreement is invalid, and she is free to

pursue her chosen profession as an executive in the private investigations sector.

      2.    Ms. Kelley-Hilton was, until October 10, 2019, the President of Sterling

Diligence, formerly known as Bishops Services (referred to herein as Sterling/Bishops).

Sterling/Bishops, a wholly owned subsidiary of Defendant Sterling Infosystems Inc. ("Sterling"),

performs detailed background investigations for law firms, banks and other financial institutions,

and other entities. In her ten years as a senior executive at Sterling/Bishops, Ms. Kelley-Hilton

was an outstanding performer, increasing revenues and profits ten-fold, as well as collecting accolades and compensation increases.

3.     At times, Sterling/Bishops has performed investigations for foreign governments as part of those governments' citizenship by investment programs, under which individuals (and immediate family members) could apply for citizenship status contingent upon a specified and quantifiable investment in the country.

4.     During 2018, Ms. Kelley-Hilton became concerned that Sterling/Bishops was violating the United States sanctions against Iran by performing investigations for Iranian nationals on behalf of foreign governments. Eventually, after consulting with internal and outside counsel, Ms. Kelley-Hilton advised Sterling Infosystems's General Counsel, Steve Barnett, that Sterling should self-report violations of the Iranian sanctions. Mr. Barnett responded that he was "not really the self-disclosing kind of guy."

5.     Thereafter, in retaliation for Ms. Kelley-Hilton's insistence that Sterling self-report its unlawful conduct, Sterling's upper management stripped Ms. Kelley-Hilton of her responsibilities, reduced her compensation, decreased her visibility at the company and isolated her, blamed her for company performance issues that were not her fault and ultimately terminated her employment in violation of the public policy of the State of Colorado.

6.     In addition, having wrongfully terminated Ms. Kelley-Hilton's employment, Sterling is claiming that she is bound by a non-compete agreement that is invalid by virtue of the wrongful, without cause discharge, because it contains overly broad and unreasonable non-compete and non-solicit clauses and because of Sterling's unclean hands.  Enforcement, or even threatened enforcement, of this provision will prevent Ms. Kelley-Hilton from continuing in her profession and leave her with no way to support her family.

## THE PARTIES

7.     Plaintiff Melissa Kelley-Hilton is, as of the time of the filing of this action, domiciled in Naples, Florida.

8.     Defendant Sterling Infosystems Inc. is a corporation organized under the laws of Delaware with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 based on diversity of citizenship of the parties and the amount in controversy exceeding $75,000.

10.     This Court has personal jurisdiction over Defendant based on Defendant's conduct of business in New York from its office at 1 State Street Plaza, New York, NY 10004.

11.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 (b)(1) in that Defendant resides in this jurisdiction.

## STATEMENT OF FACTS

### Ms. Kelley-Hilton's Nine-Year Success Run at Bishops.

12.     After managing another company in the private investigation/background check sector since 2000, Ms. Kelley-Hilton began working for Sterling as Executive Vice-President of its Bishops Services Inc. subsidiary in 2009.

13.     At that time, Sterling/Bishops's annual revenue was approximately $600,000 to $700,000. Ms. Kelley-Hilton grew the business significantly, opening several new offices, hiring a number of new employees, expanding certain lines of business and taking on the supervision of the sales functions. As a result of Ms. Kelley-Hilton's efforts, revenues increased to $1 million in the first year and eventually, by 2018, to almost $10 million. Ms. Kelley-Hilton consistently outperformed Sterling's own projections for the subsidiary.

14.    During this period, Ms. Kelley-Hilton's outstanding performance was recognized through base compensation increases, bonuses, and commissions for the business she personally won, as well as accolades from Sterling's senior management including Billy Greenblatt (Sterling's founder, Chairman, and former CEO), Josh Peirez (current CEO), Richard Seldon (former President and current Vice Chairman) and Lou Paglia (Ms. Kelley-Hilton's former manager and current Sterling President).

**Ms. Kelley-Hilton Learns of and Reports Unlawful Conduct.**

15.    All of this changed, however, toward the end of 2018.

16.    In early 2018, Ms. Kelley-Hilton became concerned that Sterling/Bishops's Citizenship work was violating the sanctions against Iran imposed by the United States Treasury Department's Office of Foreign Asset Control (OFAC).

17.     This work involved performing investigations on applicants for certain programs offered by other countries under which the applicants and family members could receive citizenship in exchange for making an investment in the country. Ms. Kelley-Hilton learned that some of the applicants Sterling/Bishops was investigating were Iranian nationals seeking citizenship from other countries.

18.    In February 2018, Ms. Kelley-Hilton had communications concerning this issue with an outside law firm and also with Steve Barnett, Sterling's General Counsel. Later in 2018, one of Sterling/Bishops's government clients, for which Sterling/Bishops performed Citizenship investigations, itself raised concerns about whether the work violated the sanctions law. After communications with a different outside counsel concerning the issue, Ms. Kelley-Hilton suggested to Mr. Barnett that it might be necessary for Sterling/Bishops to self-report the violation to OFAC.

19.   OFAC's regulations encourage companies who have violated U.S. sanctions to self-report the violation. OFAC's Economic Sanctions Enforcement Guidelines, codified at 31 CFR Part 501 Appendix A, state that in determining whether administrative action will be taken in the case of a sanction violation and in determining the penalty to be imposed, OFAC will consider, among other factors, the degree of cooperation with OFAC, beginning with whether the party in violation self-disclosed the apparent violation to OFAC. *Id*. at Part III(g).

20.   Mr. Barnett, however, rejected Ms. Kelley-Hilton's suggestion, stating that he was "not really the self-disclosing kind of guy."

**Sterling Retaliates Against Ms. Kelley-Hilton for Whistleblowing.**

21.    Almost immediately, Sterling senior management began to retaliate against Ms. Kelley-Hilton for raising the issue of the potential sanctions violation.

22.   In September 2018, Ms. Kelley-Hilton was excluded from a senior Sterling strategy and leadership meeting that she had consistently been invited to in the past. When Ms. Kelley-Hilton brought this up to senior management, she was told that the meeting did not deal with issues related to Sterling/Bishops and executives at subsidiaries such as Sterling/Bishops had not been invited to the meeting. Later in 2018, however, Ms. Kelley-Hilton learned that subsidiary executives had, in fact, attended the meeting and that issues related to Sterling/Bishops had, in fact been discussed. Ms. Kelley-Hilton was subsequently excluded from other meetings, including meetings to which she had previously been invited such as the Sterling President's Club meeting in March 2019.

23.   In December 2018, Ms. Kelley-Hilton was effectively demoted when her reporting relationship changed from reporting directly to Sterling's President, Lou Paglia, to a Senior Vice-President, Joy Henry. In addition, Ms. Kelley-Hilton's direct reports began to be

taken away from her beginning with Yan Ma, Sterling/Bishops Marketing Director, who began to report to Ms. Henry. Moreover, important decisions concerning the Sterling/Bishops business were made without her involvement – such as changing the name of the subsidiary from Bishops to Sterling Diligence.

24.     Sterling's senior management also began to significantly reduce Ms. Kelley-Hilton's compensation. Since her hire in 2009, Ms. Kelley-Hilton had received commission on deals she was personally involved in winning for Bishops. In 2018, Ms. Kelley-Hilton had become personally involved in obtaining a large account for Sterling/Bishops that the company had not been able to secure. Ms. Kelley-Hilton repeatedly met with the potential client and managed a small team that designed first a prototype product and eventually the final work product/fulfillment process to the client's satisfaction.  In March 2019, Ms. Kelley-Hilton was told that she would no longer receive commission effective January 1, 2019, including on this large deal, depriving her – retroactively – of hundreds of thousands of dollars in commission. Ms. Kelley-Hilton was subsequently taken off the deal, which ended up delaying its final execution.

25.     In March 2019, despite Sterling/Bishops having the best year in its history under Ms. Kelley-Hilton's management, Ms. Kelley-Hilton received her first negative review, in which her accomplishments were ignored, and she was criticized for extremely pretextual matters. At this time, Ms. Kelley-Hilton was told she would not be receiving her full 2018 bonus.

26.     Throughout 2019, Sterling's diminution of Ms. Kelley-Hilton continued. Her direct reports continued to be taken away from her, such that, by the time of her eventual termination, there was only one person reporting to her. While Ms. Kelley-Hilton still had

direct reports, Ms. Henry eroded her authority by dealing directly with them. As a result of the many changes to Sterling/Bishops's business, including the name change, as well as some external factors, such as changes in sanctions laws, revenues continued to grow; however, the company was not hitting its aggressive 2019 targets. Ms. Kelley-Hilton was solely blamed for missing the company's revenue targets, even though it was completely due to factors outside her control and was in fact a direct result of senior management's attacks on her.

27.    In July 2019, Ms. Kelley-Hilton's role was additionally reduced when she was given a new position as President, Citizenship, a much smaller business unit and the same unit about which she had raised legal concerns. When Ms. Kelley-Hilton complained about the reduced role, she was told that the alternative was termination.  Thereafter, Ms. Kelley-Hilton had to listen while Ms. Henry informed all of Ms. Kelley-Hilton's now former direct reports that it was her inability to meet the numbers that had resulted in this change.

28.    In Ms. Kelley-Hilton's new role, she was tasked with bringing in three to four new foreign country clients. Yet senior leadership slashed her marketing and travel and expense budget such that Ms. Kelley-Hilton was unable to effectively market the company to these foreign clients. Ms. Kelley-Hilton was further isolated as her team members were instructed by Ms. Henry to communicate with Ms. Henry and not to communicate with Ms. Kelley-Hilton.

29.    As a final humiliation, Ms. Henry terminated Ms. Kelley-Hilton's executive assistant in October 2019.

30.    On October 7, 2019, Sterling senior management's retaliatory campaign against Ms. Kelley-Hilton culminated with Mr. Barnett, Sterling's General Counsel, informing Ms. Kelley-Hilton that she was terminated effective October 10, 2019. At the meeting at which Ms.

Kelley-Hilton was informed of her termination, she asked for an explanation of why she was being terminated but Mr. Barnett refused to give her specifics, and only commented that it was a business decision.

### Ms. Kelley-Hilton's Employment Agreement

31.    Ms. Kelley-Hilton's employment agreement with Sterling provides:

To the extent enforceable under federal and state laws, Employee agrees that during the term of this agreement and for a period of twelve (12) months thereafter, Employee shall not compete with employer by soliciting, accepting employment as an employee, contractor, consultant, or independent contractor with any competitor or client of the Company for whom Employee has worked on behalf of Employer.

To the extent enforceable under federal and state laws, Employee agrees that during the term of this agreement and for a period of twelve (12) months thereafter, Employee shall not sell any competing goods and services to any client whom Employer introduces to Employee, nor shall Employee do any work for or contract with any competitor or client to whom Employer introduces Employee.

To the extent enforceable under federal and state laws, Employee agrees that during the term of this agreement and for a period of twelve (12) months thereafter, Employee will not solicit, entice, or persuade any other Employee of Employer or Employer's clients to leave the services of the employer for any reason.

32.    Sterling has materially breached this employment agreement with her by terminating her employment without cause and in retaliation for her reports of unlawful conduct by Sterling. As a result, Ms. Kelley-Hilton is relieved of any obligation under her employment agreement, including the non-compete and non-solicit provisions.

33.    Alternatively, the non-compete and non-solicit provisions of the employment agreement are far broader than necessary for the protection of Sterling's legitimate interests and impose an undue burden on Ms. Kelley-Hilton's ability to earn a living and provide for her family, which includes two daughters ages 5 and 10, and are invalid and unenforceable for that reason.

34.     Alternatively, Sterling's conduct constitutes unclean hands which preclude it from obtaining injunctive relief against Ms. Kelley-Hilton.

35.     Sterling has informed Ms. Kelley-Hilton that it intends to enforce the non-compete and non-solicit provisions against her. If these provisions are enforced, Ms. Kelley-Hilton will be deprived of the opportunity to continue her profession as an executive in private investigation services. Specifically, Ms. Kelley-Hilton has been offered an opportunity to launch a venture that would offer services similar to those offered by Sterling/Bishops, which would likely provide her with hundreds of thousands of dollars of compensation and equity. Enforcement of the non-compete and non-solicit provisions would prevent Ms. Kelley-Hilton from pursuing that opportunity.

## COUNT I
### (Wrongful Discharge in Violation of Colorado Public Policy)

36.     The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

37.     Ms. Kelley-Hilton was employed in Colorado at all relevant times.

38.     As set forth in OFAC regulations, public policy supports the self-reporting of apparent sanctions violations to OFAC.

39.     Ms. Kelley-Hilton advocated in favor of self-reporting Defendant's sanctions violation to OFAC. In retaliation, Defendant harassed Ms. Kelley-Hilton and ultimately terminated her employment.

40.     As a result of her wrongful termination, Ms. Kelley-Hilton has suffered lost compensation and extreme emotional distress.

## COUNT II
### (Declaratory Judgment – Sterling Has Materially Breached the Employment Agreement)

41.    The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

42.    Ms. Kelley-Hilton seeks a declaratory judgment to determine whether Sterling has materially breached any employment agreement still in force thereby relieving her of any obligations under the non-compete and non-solicit provisions.

43.    Sterling breached any employment agreement with Ms. Kelley-Hilton by terminating her employment without cause and in retaliation for her reporting of unlawful conduct on the part of Sterling. Sterling's material breach relieves Ms. Kelley-Hilton of any obligation under the non-compete and non-solicit provisions.

**COUNT III**
(Declaratory Judgment – Non-Compete and Non-Solicit Unreasonable and Unenforceable)

44.    The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

45.    Ms. Kelley-Hilton seeks a declaratory judgment to determine that the non-compete and non-solicit provisions are null, void, and unenforceable.

46.    The non-compete and non-solicit provisions do not protect Sterling's legitimate interests and are instead aimed at stifling competition, among other things.

47.    The non-compete and non-solicit provisions impose an undue hardship on Ms. Kelley-Hilton because they deprive her of the ability to earn a livelihood in her profession of choice.

48.    The unreasonable, over-broad, and unduly burdensome restrictive covenants injure the public interest because, among other things, they unreasonably restrain competition and deprive the public of Ms. Kelley-Hilton's expertise.

**COUNT IV**

(Declaratory Judgment – Unclean Hands)

49.   The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

50.   Ms. Kelley-Hilton seeks a declaratory judgment to determine that Sterling's conduct constitutes unclean hands which deprives it of the ability to seek equitable relief.

51.   By terminating Ms. Kelley-Hilton's employment without cause and in retaliation for her reporting of unlawful conduct on the part of Sterling, Sterling has unclean hands which precludes it from seeking equitable relief.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court grant a judgment:

A.   Reinstating Plaintiff's employment with Defendant and upon reinstatement, enjoining Defendant from retaliation against Plaintiff in violation of public policy in the terms and conditions of her employment;

B.   Awarding Plaintiff back pay;

C.   Awarding Plaintiff compensatory damages, including but not limited to damages for emotional distress;

D.   Awarding Plaintiff punitive damages;

E.   Declaring that:

i.  Sterling has materially breached any employment agreement in force with Plaintiff by terminating her wrongfully and without cause, thereby relieving Plaintiff of any obligation to abide by the non-compete and non-solicit provisions;

ii. Alternatively, the non-compete and non-solicit provisions of Plaintiff's employment agreement are overbroad, unreasonable provisions that go beyond protecting Sterling's legitimate interests and accordingly, null and void;

iii. Alternatively, Sterling's unclean hands preclude it from seeking equitable relief against Plaintiff;

F.     Awarding attorneys' fees and the costs of this action; and;

G.     Such other relief as the Court deems necessary and proper.

### **DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
       October 28, 2019

Respectfully submitted,

**GISKAN SOLOTAROFF & ANDERSON LLP**

/s

By:     _____
Jason L. Solotaroff
90 Broad Street, 10th Floor
New York, NY 10004
(212) 847-8315
Attorneys for Plaintiff