UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
MELISSA KELLEY-HILTON,                :
                                      :
                   Plaintiff,         :          19cv9963 (DLC)
                                      :
        -v-                           :          OPINION AND ORDER
                                      :
STERLING INFOSYSTEMS INC.,            :
                                      :
                   Defendant.         :
                                      :
------------------------------------- X

APPEARANCES

For the plaintiff:
Giskan Solotaroff & Anderson LLP
Jason L. Solotaroff
Amy E. Robinson
90 Broad Street, 10th Floor
New York, NY 10004

For the defendant:
Seyfarth Shaw LLP
Katherine Perrelli
James S. Yu
620 Eighth Avenue
New York, NY 10018

DENISE COTE, District Judge:

     In this suit, plaintiff Melissa Kelley-Hilton alleges that

she was wrongfully terminated by her former employer, Sterling

Infosystems Inc. ("Sterling").  Kelley-Hilton has moved for a

preliminary injunction preventing Sterling from enforcing any

contractual provisions that would prohibit her from competing

with Sterling, soliciting its customers, or hiring its

employees.  For the following reasons, the motion for a
preliminary injunction is denied.

## Procedural History

Kelley-Hilton filed this action on October 28, 2019.  She
filed her motion for a preliminary injunction on November 6.  At
a November 15 conference, a preliminary injunction hearing was
scheduled for December 5.  On November 22, the defendant
submitted its Memorandum of Law in Opposition to Kelley-Hilton's
motion.  On December 1, the parties submitted proposed findings
of fact and conclusions of law, along with their hearing
exhibits and affidavits constituting the direct testimony of
their witnesses.  The following witnesses provided affidavits:
(1) the plaintiff, (2) Steven Barnett, Sterling's Chief Legal &
Risk Officer, (3) Joy Henry, Sterling's General Manager for
Financial and Business Services, (4) Danielle Korins, Sterling's
Chief People Officer, and (5) Lou Paglia, Sterling's President.
In addition, the plaintiff submitted a Pretrial Memorandum
replying to the defendant's Memorandum of Law.

On December 3, the Court informed the parties that it would
provide them with its preliminary view of the issues on the
consent of both parties.  The parties consented, and in a second
telephone conference that day, the Court explained that, for
reasons described below, it was unlikely to issue a preliminary

injunction.  On the basis of that information, the parties elected for oral argument on December 5 rather than an evidentiary hearing.

Oral argument was held on December 5, during which the parties consented to submit this motion for a decision based on the written record provided to the Court on or before December 1.  Having considered the evidence, the Court makes the following findings of fact and conclusions of law.

**<u>Findings of Fact</u>**

I.  Kelley-Hilton's Employment at Sterling

In 2009, Kelley-Hilton joined Sterling as Executive Vice President of its subsidiary Bishops Services, LLC ("Bishops"), which provides services such as pre-investment due diligence and executive-level pre-employment investigations.  In 2011, Kelley-Hilton signed a series of agreements bearing the title "Employee Agreements."  The Employee Agreements included a non-harassment policy, an alcohol and drug policy, computer usage policies, an arbitration agreement, and -- of particular importance here -- a "Non-Disclosure and Proprietary Rights Agreement" (the "NDPRA").

The NDPRA states, in relevant part:

> To the extent enforceable under Federal and State Laws, <u>employee agrees that during the term of this Agreement and for a period of twelve (12) months thereafter, Employee shall not compete with Employer</u> by soliciting, accepting employment as an employee,

contractor, consultant, or independent contractor with
any competitor or client of Employer for whom Employee
has worked on behalf of Employer [sic].

To the extent enforceable under Federal and State
Laws, employee further agrees that during the term of
this Agreement, and for a period of twelve (12) months
thereafter, Employee shall not attempt to sell any
competing goods or services to any client whom
Employer Introduces Employee [sic], nor shall Employee
do any work for or contract with any competitor or
client to whom Employer introduces Employee.

To the extent enforceable under Federal and State
Laws, during employment with Employer and for a period
of twelve (12) months afterwards Employee will not
solicit, entice or persuade any other Employee of
Employer or Employer's clients to leave the services
of their Employer for any reason.

To the extent enforceable under Federal and State
Laws, employee agrees that the foregoing restrictions
are fair and reasonable considering the scope of
Employee's employment, salary and benefits provided by
Employer and Employee further agrees that such
restrictions will not unduly restrict or prohibit
Employee from obtaining gainful employment in her
chosen profession.

(Emphasis added.)  The NDPRA further provides that it "shall be

constructed [sic] in accordance with the Laws of the State of

New York."

        In 2015, Kelley-Hilton received a grant of stock options

and signed an agreement entitled "Sterling Ultimate Parent Corp.

2015 Long-Term Equity Incentive Plan Nonqualified Stock Option

Agreement" (the "Stock Option Agreement").  The Stock Option

Agreement includes a "Restrictive Covenants" provision.  The

provision explains that the restrictions in the Stock Option

Agreement do not supersede those to which an employee is already subject:

> For the avoidance of doubt, from and after the Grant Date, if and to the extent the Participant is party to an Employee Agreement that provides for restrictive covenants relating to nondisclosure of confidential information, noncompetition, nonsolicitation, and/or nondisparagement, the Participant shall be subject to the provisions of such Employee Agreement and shall not be subject to the following provisions . . . .

Those "following provisions" in the Stock Option Agreement impose restrictions on disclosure of confidential information, retention of intellectual property rights, competition, solicitation, and disparagement.

Of particular relevance here, the Stock Option Agreement includes the following restrictions:

> <u>Noncompetition.</u>  The Participant agrees that during the course of the Participant's employment or other service with any Company Party and during the period of twelve (12) months commencing from the Date of Termination (the "<u>Restricted Period</u>"), the Participant will not, without the express prior written consent of the Company, anywhere, either directly or indirectly . . . engage in or otherwise be connected to or benefit from any Competitive Business.  For purposes of this Agreement, a "<u>Competitive Business</u>" is one that engages in or provides, or intends to engage in or provide, employment, volunteer or tenant-related background checks and related services or engages in any other business that is the same or substantially the same as any business engaged in or in development by the Company as of the Date of Termination. . . .

> <u>Nonsolicitation.</u>  The Participant further agrees that, during the course of the Participant's employment or other service with any Company Party and during the period of two (2) years commencing from the Date of

5

Termination, the Participant will not, without the
express prior written consent of the Company, directly
or indirectly, (i) in connection with a Competitive
Business, solicit, transact business with or perform
services for . . . any person or entity that is or was
(at any time within twelve (12) months prior to the
contact, communication, solicitation, transaction of
business, or performance of services), a customer or
prospective customer . . . of any Company Party, (ii)
hire or solicit or encourage any employee of any
Company Party to leave the employment of such Company
Party, in each case except for general solicitations
of employment by the Participant . . . not
specifically directed towards employees of any Company
Party, or (iii) interfere with, disrupt or attempt to
interfere with or disrupt the relationship,
contractual or otherwise, between any Company Party
and any of its customers, suppliers, vendors, lessors,
independent contractors, agents or employees.

The Stock Option Agreement provides that it "shall be governed
by and construed according to the laws of the State of
Delaware."

While Kelley-Hilton worked at Bishops, she was responsible
for overseeing all operations in the investigations group and
led thousands of individual investigations. During her tenure,
Kelley-Hilton worked with numerous clients, including investment
banking and private equity firms, venture capital and hedge
funds, real estate investment trusts, commercial lending
institutions, law firms, and corporations. Kelley-Hilton also
oversaw investigations for governmental clients that operate
citizenship-by-investment programs. These programs allow
wealthy individuals to obtain citizenship or residency in

6

exchange for an investment in or donation to the relevant country.[1]

In December 2018, Sterling began a corporate reorganization that, among other things, created managerial positions that would oversee each of Sterling's key client industries, such as financial services, healthcare, or retail. Sterling placed Bishops in the new reporting hierarchy for financial and business services. As part of the restructuring, Bishops was rebranded "Sterling Diligence."

II. The Termination of Kelley-Hilton's Employment

Following the restructuring, Kelley-Hilton's responsibilities and resources were reduced. Kelley-Hilton was deeply unhappy with these changes, and in August 2019 she retained counsel. In early September, Kelley-Hilton initiated a series of conversation with management about terms of a potential separation from Sterling. Unbeknownst to Sterling executives, the plaintiff recorded many of these conversations.

During a call on September 5, 2019 with Joy Henry, Sterling's General Manager of Financial and Business Services,

───────────────

[1] See generally Allison Christians, Buying In: Residence and Citizenship by Investment, 62 St. Louis U. L.J. 51, 51-53 (2017); Jeff Veteto, The Alienability of Allegiance: An International Survey of Economic Citizenship Laws, 48 Int'l Law. 79, 80-81 (Summer 2014); Sterling Diligence, Solutions (last visited Dec. 4, 2019), https://www.sterlingdiligence.com/solutions.

and Danielle Korins, Sterling's Chief People Officer, Kelley-Hilton expressed her unhappiness, and Korins indicated that it would be possible for Kelley-Hilton to leave the company with severance pay. The next day, in a call with Henry alone, Kelley-Hilton noted that Korins "had said that . . . if I didn't like a decision, that there was a severance package that she could write up." Kelley-Hilton continued, "I guess I'd like to see what that would look like." During September and October, Kelley-Hilton had numerous communications with Sterling employees concerning possible terms for her separation from the company. These negotiations were unsuccessful and culminated in a call on October 7, during which Steven Barnett, Sterling's Chief Legal & Risk Officer, told Kelley-Hilton that her employment would be terminated. By an email of the same day, Barnett confirmed that Kelley-Hilton's employment with Sterling would end on October 10.

## Conclusions of Law

A party seeking a preliminary injunction is generally required to show (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, (2) that the moving party is likely to suffer irreparable injury in the absence of a preliminary injunction, (3) a balance of the

hardships tipping in favor of the moving party, and (4) that the public interest would not be disserved by the issuance of a preliminary injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010); Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 38 (2d Cir. 2010). When the requested injunction would alter, rather than maintain, the status quo, the moving party must show a "substantial" likelihood of success on the merits. N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (citation omitted).

A court may not "presume that the plaintiff will suffer irreparable harm;" rather the plaintiff must demonstrate actual harm that cannot be remedied later by monetary damages should the plaintiff prevail on the merits. Salinger, 607 F.3d at 80. Harm may be irreparable where the loss is difficult to replace or measure, or where a plaintiff should not be expected to suffer the loss. Id. at 81. Courts must pay "particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for [the] injury.'" Id. at 80 (quoting eBay, 547 U.S. at 391).

Kelley-Hilton seeks a declaratory judgment that, because Sterling terminated her employment without cause, it may not enforce any restrictive covenants against her. Three

determinations are necessary to evaluate the likelihood of the success of this claim. First, the 2011 NDPRA provides the restrictive covenants applicable to the plaintiff, not the 2015 Stock Option Agreement. And therefore New York law applies. Second, New York law does not prohibit the enforcement of restrictive covenants against an employee who is terminated without cause. It requires only that the scope of the covenants be reasonable. Third, the restrictive covenants in the NDPRA are reasonable.

I.    The Applicable Contract

The Stock Option Agreement provides that "if and to the extent the Participant is party to an Employee Agreement" then that prior agreement provides the applicable restrictive covenants rather than the Stock Option Agreement. Sterling argues that the term "Employee Agreement" in the Stock Option Agreement does not encompass the NDPRA signed by Kelley-Hilton in 2011.

Defendant's position is counterintuitive from the start, since the NDPRA was provided to Kelley-Hilton as part of a package entitled "Employee Agreements." And defendant's argument fares no better on closer examination of the contracts. The Stock Option Agreement defines "Employee Agreement" simply as "the employment agreement or severance agreement . . .

between the Participant and the Company." There is no reason to doubt that the "Employee Agreements" Sterling presented to the plaintiff were employment agreements between her and the company.

Sterling argues that the "Employee Agreements" cannot be an "Employee Agreement" within the meaning of the Stock Option Agreement because the Stock Option Agreement includes the following language:

> "Cause" has the same meaning given to such term in the employment agreement or severance agreement (the "Employee Agreement") between the Participant and the Company or its affiliate, or if the Participant is not a party to an Employee Agreement, then "Cause" has the same meaning given to such term in the [Sterling Ultimate Parent Corp. 2015 Long-Term Equity Incentive Plan].

Since Kelley-Hilton's 2011 Employee Agreements do not contain a definition of "Cause," Sterling maintains that they cannot be an Employee Agreement contemplated by the Stock Option Agreement.

But Sterling's argument asks more than the above-quoted language can bear. Potential confusion results from the fact that the Stock Option Agreement uses a single clause to define both "Cause" and "Employee Agreement." But the definition of "Cause" does not limit the definition of "Employee Agreement," which is simply an "employment agreement." While the 2011

Employee Agreements do not contain a definition of "Cause," they are nonetheless obviously an "employment agreement."[2]

Moreover, in the portion of the Stock Option Agreement addressed specifically to restrictive covenants, the Stock Option Agreement expressly provides that "restrictive covenants relating to" "noncompetition" and "nonsolicitation" shall be subject to the Employment Agreement and not to the provisions of the Stock Option Agreement that address those topics. The intent of the Stock Option Agreement to provide the employer and employee with one set of rules to follow and not to displace those obligations already in place is clear.[3] It is thus the NDPRA, not the Stock Option Agreement, that provides the restrictive covenants applicable to Kelly-Hilton.

---

[2] Even if it were not so clear, ambiguity in the Stock Option Agreement should be resolved against Sterling, which drafted the agreement. See Twin City Fire Ins. Co. v. Delaware Racing Ass'n, 840 A.2d 624, 630 (Del. 2003) (recognizing the "the well-accepted contra preferentem principle of construction, which is that ambiguities in a contract should be construed against the drafter").

[3] If Kelley-Hilton had not entered into the Stock Option Agreement in 2015, Sterling would presumably insist that the NDPRA contained enforceable restrictive covenants. As a matter of plain language, Kelley-Hilton was therefore "party to an Employee Agreement that provides for restrictive covenants relating to . . . noncompetition [and] nonsolicitation" before she signed the Stock Option Agreement.

II. Enforceability of Restrictive Covenants Under New York Law

As noted above, the NDPRA contains a New York choice-of-law clause. The parties seem to agree that New York law consequently governs the enforceability of the restrictive covenants in the NDPRA. See Arnone v. Aetna Life Ins. Co., 860 F.3d 97, 108 (2d Cir. 2017) (noting that "choice of law provisions are generally enforceable under both New York law and federal common law").

Under New York law, "covenants not to compete should be strictly construed because of the powerful considerations of public policy which militate against sanctioning the loss of a person's livelihood." Brown & Brown, Inc. v. Johnson, 34 N.E.3d 357, 361 (N.Y. 2015) (citation omitted). A covenant restricting competition is enforceable only "to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." BDO Seidman v. Hirshberg, 712 N.E.2d 1220, 1223 (N.Y. 1999) (citation omitted). The New York Court of Appeals has held that one legitimate interest of the employer is "[p]rotection of customer relationships the employee acquired in the course of employment." Id. at 1224. In particular, when "the employee must work closely with the client or customer over a long period

of time," then "the employee has been enabled to share in the goodwill of a client or customer which the employer's over-all efforts and expenditures created."  Id. at 1224-25 (citation omitted).  New York courts therefore reason that "[t]he employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment."  Id. at 1225.  Applying this standard, the New York Court of Appeals has allowed an accounting firm to restrict a former employee's ability to serve its clients for up to eighteen months.  Id.

New York has, however, "recognized an exception to the general disfavor of noncompete provisions," known as the "'employee choice' doctrine."  Morris v. Schroder Capital Mgmt. Int'l, 859 N.E.2d 503, 506 (N.Y. 2006).  The doctrine "applies in cases where an employer conditions receipt of post-employment benefits upon compliance with a restrictive covenant" and "rests on the premise that if the employee is given the choice of preserving his rights under his contract by refraining from competition or risking forfeiture of such rights by exercising his right to compete, there is no unreasonable restraint upon an employee's liberty to earn a living."  Id.  "An essential

element to the doctrine is the employer's continued willingness
to employ the employee." Id. (citation omitted). "Thus,
although a restrictive covenant will be enforceable without
regard to reasonableness if an employee left his employer
voluntarily, a court must determine whether forfeiture is
'reasonable' if the employee was terminated involuntarily and
without cause." Id. at 507.

Plaintiff argues that her employment was terminated without
cause and consequently that her restrictive covenants are
unenforceable.[4] In support of this argument, the plaintiff
principally relies upon Post v. Merrill Lynch, Pierce, Fenner &
Smith, Inc., 397 N.E.2d 358 (N.Y. 1979). There, plaintiffs'
employment had been terminated by Merrill Lynch, and they
subsequently went to work for one of the firm's competitors.
Id. at 359. Fifteen months after that termination, Merrill
Lynch informed the plaintiffs that they had forfeited their
pensions, "pursuant to a provision of the plan which permitted
forfeiture in the event that an employee directly or indirectly
competed with the firm." Id. The New York Court of Appeals
wrote,

---

[4] Sterling argues, not without force, that Kelley-Hilton
engineered the termination of her employment in the hope that a
termination "without cause" would extricate her from the
restrictive covenants. It is not necessary to resolve this
factual dispute.

> Acknowledging the tension between the freedom of
> individuals to contract, and the reluctance to see one
> barter away his freedom, the State enforces limited
> restraints on an employee's employment mobility where
> a mutuality of obligation is freely bargained for by
> the parties. An essential aspect of that
> relationship, however, is the employer's continued
> willingness to employ the party covenanting not to
> compete. Where the employer terminates the employment
> relationship without cause, however, his action
> necessarily destroys the mutuality of obligation on
> which the covenant rests as well as the employer's
> ability to impose a forfeiture.

Id. at 360-61.

The plaintiff would prefer to treat this broad dictum as Post's holding. But the decision as a whole reveals that it is limited to cases involving a forfeiture of postemployment benefits. In particular, the New York Court of Appeals reasoned that it was required to "take into account the declaration of a strong public policy against forfeiture of employee benefits manifested by the Employee Retirement Income Security Act of 1974 (ERISA)" and observed that, had ERISA been in effect at the time of the plaintiffs' termination, it might have prohibited the forfeiture outright. Id. at 360. Also, Post began its discussion by stating the background rule that persists today: Restrictive covenants will be enforced "to the extent that they are reasonably necessary to protect the legitimate interests of the employer and not unduly harsh or burdensome to the one restrained." Id. at 359. The Court of Appeals then framed the

employee-choice doctrine as an exception to this baseline rule:
In the case of the receipt of postemployment benefits,
noncompete provisions are not generally disfavored.  Id. at 360.
Post's holding concerning terminations without cause is thus an
exception to the exception:  Where the employer terminates the
employment relationship without cause, then the employer may not
unreasonably condition receipt of postemployment benefits on the
employee's compliance with restrictive covenants.  Id. at 360-
61.

     This reading of Post is confirmed by the summary of the
doctrine offered by the New York Court of Appeals in Morris v.
Schroder Capital Management International, another case
addressing receipt of postemployment benefits, to wit, deferred
compensation.  859 N.E.2d at 505.  Where postemployment benefits
are at stake, "a restrictive covenant will be enforceable
without regard to reasonableness if an employee left his
employer voluntarily, [but] a court must determine whether
forfeiture is 'reasonable' if the employee was terminated
involuntarily and without cause."  859 N.E.2d at 507; see also
Morris v. Schroder Capital Mgmt. Int'l, 481 F.3d 86, 88 (2d Cir.
2007) (per curiam) (relying on this statement of the doctrine,

following certified question to the New York Court of Appeals).[5]
In short, the plaintiff misreads Post to stand for the
proposition that no form of restrictive covenant is enforceable
following a termination without cause. This reading ignores the
context and issue in Post -- receipt of postemployment benefits
that the employer was contractually bound to give its former
employee. The law in New York is in fact that contractual
forfeitures of postemployment benefits are per se enforceable
for a violation of a restrictive covenant, unless the employee
was terminated without cause, in which case the standard
reasonableness analysis applies to any restrictive covenant.
Morris, 859 N.E.2d at 507; see also Lenel Sys. Int'l, Inc. v.
Smith, 966 N.Y.S.2d 618, 621 (N.Y. App. Div. 2013) (stock
options); Scott v. Beth Israel Med. Ctr., Inc., 838 N.Y.S.2d
521, 523 (N.Y. App. Div. 2007) (severance payment); Hall v.
Edgewood Partners Ins. Ctr., Inc., 878 F.3d 524, 528-29 (6th
Cir. 2017) (noting that Post's applicability is limited to
forfeitures of postemployment benefits).[6]

---

[5] The parties discuss the implications of the Second Circuit's
summary order in Hyde v. KLS Prof'l Advisors Grp., LLC, 500 F.
App'x 24, 26 (2d Cir. 2012) (cautioning against "extending Post
beyond its holding"). The Court of Appeals for the Second
Circuit does not give precedential weight to its summary orders.
See IOP 32.1.1(b).

[6] The plaintiff has identified two cases that seem to read Post
more broadly. See Buchanan Capital Markets, LLC v. DeLucca, 41

18

In short, because Kelley-Hilton does not assert that the defendant has denied her access to any postemployment benefits she is contractually entitled to receive, it is irrelevant whether her employment was terminated with or without cause. The applicable standard is New York's common-law reasonableness analysis:  Kelley-Hilton's restrictive covenants are enforceable if they (1) are no more restrictive than required for protection of Sterling's legitimate interests, (2) do not impose undue hardship on Kelley-Hilton, and (3) are not injurious to the public.  See <u>BDO Seidman</u>, 712 N.E.2d at 1223.

III. Application to Kelley-Hilton's Restrictive Covenants

The plaintiff has focused solely on the argument that her without-cause termination renders her restrictive covenants unenforceable, to the exclusion of an argument that the covenants are unreasonable in scope.[7]  It would therefore be

_____

N.Y.S.3d 229, 230 (N.Y. App. Div. 2016); <u>Grassi & Co., CPAs, P.C. v. Janover Rubinroit, LLC</u>, 918 N.Y.S.2d 503, 505 (N.Y. App. Div. 2011).  These relatively short opinions do not examine <u>Post</u> in detail or account for the New York Court of Appeals' decision in <u>Morris</u>.  Insofar as state law is unsettled, a federal court sitting in diversity must "carefully predict how the state's highest court would resolve the uncertainty or ambiguity," giving "proper regard to the relevant rulings of a state's lower courts."  <u>In re Thelen LLP</u>, 736 F.3d 213, 219 (2d Cir. 2014) (citation omitted).  In light of <u>Morris</u>, the cases identified by plaintiff do not provide a reliable source for predicting how the New York Court of Appeals would resolve this case.

[7] The plaintiff has cursorily argued that the noncompete provision in the NDPRA would only prohibit her from accepting

sufficient to say that the plaintiff has not carried her burden

to show a likelihood of success on the merits.   In the interest

of completeness, the Court notes that New York courts have

upheld as reasonable restrictive covenants of similar breadth to

those in the NDPRA.   See TBA Glob., LLC v. Proscenium Events,

LLC, 980 N.Y.S.2d 459, 461 (N.Y. App. Div. 2014) (upholding two-

year nonsolicitation provision); Crown IT Servs., Inc. v. Koval-

Olsen, 782 N.Y.S.2d 708, 710 (N.Y. App. Div. 2004) (finding "no

serious dispute" that a one-year nonsolicitation provision was

reasonable); Integra Optics, Inc. v. Messina, 41 N.Y.S.3d 719,

2016 WL 3917764, at *3 (N.Y. Sup. 2016) (stating that a one-year

noncompete "falls well within prevailing notions of

reasonableness" and that no geographic limitation was necessary

where the employer operated in a market that was worldwide in

_____

employment at one of Sterling's existing competitors, not from
opening her own business to compete with Sterling.  But the
NDPRA prohibits any "attempt to sell any competing goods or
services to any client" that Sterling introduced to Kelley-
Hilton.  And it prohibits "entic[ing] or persuad[ing]"
Sterling's employees to "leave the services of their employer
for any reason."  In her affidavit submitted in support of the
motion for a preliminary injunction, Kelley-Hilton has
represented (1) that in order to operate a competing business
she needs to serve Sterling's clients and (2) that she would
like to recruit Sterling employees to her new venture.  Even if
plaintiff's construction were correct, her representations
indicate that it would not provide the relief she seeks.
Consequently -- and because this issue has not been the focus of
the parties' briefing -- the Court declines to definitively
construe the NDPRA at this stage.

scope but "narrow and well-defined").  On the present record, plaintiff has not shown a likelihood of success of the merits or serious questions concerning the merits of her claims.  Kelley-Hilton is thus not entitled to a preliminary injunction, and it is unnecessary to consider the remaining elements of the preliminary-injunction inquiry.

## Conclusion

Plaintiff's November 7 motion for a preliminary injunction is denied.


Dated:     New York, New York
           December 5, 2019

                                   DENISE COTE
                         United States District Judge